**EXHIBIT A**

# DELIVERY SERVICE AGREEMENT

**by and between**

<mark>Moderno Logistics Corp</mark>

**And**

**XPO LAST MILE, INC.**

This Agreement (as defined in Section 1), effective 04/22/2021 ("Effective Date"), is made by and between XPO Last Mile, Inc., with offices at 1851 West Oak Parkway, Suite 100, Marietta, GA  30062 ("XPO Last Mile") and Moderno Logistics Corp, having an office at 14302 Ward Rd, , orlando, FL, 32824 ("Contract Carrier"). XPO Last Mile and Contract Carrier shall be collectively referred to as the "Parties".

**WHEREAS**, Contract Carrier is authorized as a motor carrier by the Federal Motor Carrier Safety Administration, and as an established motor carrier, owns and operates an independent delivery business; and

**WHEREAS,** XPO Last Mile is authorized as a freight forwarder by the Federal Motor Carrier Safety Administration and provides logistical and warehousing services to its national retail customers; and

**WHEREAS,** Contract Carrier represents that it is a fully qualified motor carrier in interstate commerce and owns and operates a business which can meet the requirements of XPO Last Mile's retail customers; and

**WHEREAS,** Contract Carrier seeks to provide delivery and related services to XPO Last Mile and XPO Last Mile desires to engage Contract Carrier to provide delivery and related services;

**IT IS, THEREFORE**, in consideration of the mutual covenants contained herein, agreed as follows:

**Objectives.**  This Agreement sets forth arrangements to accomplish the safe and efficient pick up, transportation, delivery, and installation of freight.  These objectives are strictly limited to achieving required results – delivery and installation services which meet the service levels of XPO Last Mile's customers.  The manner and means of obtaining such results are entirely within the discretion of Contract Carrier.  No officer, employee or agent of XPO Last Mile shall have the authority to impose any term or condition on Contract Carrier which is contrary to this understanding, and nothing in this Agreement shall be interpreted in a contrary manner.

1. **Agreement.**  This Agreement consists of the Delivery Service Agreement (the "DSA"), all Schedule A's which may be entered into between the Contract Carrier and XPO Last Mile on or after the effective date of the DSA, attached Schedule B, and all other written modifications, addenda and schedules which are executed by both Parties contemporaneous with or after the execution of the DSA.  This Agreement may not be modified except by writing, duly executed by both Parties.  This Agreement supersedes prior negotiations, representations and agreements, whether written or oral.  Any documents executed by both Parties prior to the effective date of this Agreement shall not modify any of the terms of the Agreement.

2. **Engaged Services.**  The parties agree that the engagement of services is non-exclusive.  Contract Carrier warrants that its business has the capacity to, and shall promptly accept, timely deliver and install freight tendered by XPO Last Mile on dates in which it has offered its services.  Contract Carrier is not obligated to accept freight and may transport freight for other companies.  Contract Carrier acknowledges that XPO Last Mile has not provided any representation, guarantee or warranty that: (a) any particular volume of freight will be tendered by

XPO Last Mile to Contract Carrier; and (b) XPO Last Mile will use the services of Contract Carrier on each and every instance in which Contract Carrier is available to haul freight.

3.1    **Service Results.**  Contract Carrier acknowledges that it maintains discretion and control to accomplish its obligations under this Agreement.  XPO Last Mile does not evaluate Contract Carrier's performance.  XPO Last Mile's obligations herein are limited to tendering to Contract Carrier freight which is ready for immediate delivery.  Contract Carrier shall deliver such freight and achieve results which meet the levels of service established by XPO Last Mile's customers.  To achieve these business objectives, Contract Carrier:

(a)    Will maintain the capacity necessary to provide pick up, delivery, and related services on days and at times which are compatible with XPO Last Mile's customer schedules;

(b)    Has the expertise to handle, load, unload and transport merchandise using methods that are designed to avoid theft, loss and damage;

(c)    Will cooperate with XPO Last Mile's employees, customers and other Contract Carriers to achieve the goal of efficient pick-up, delivery, handling, loading and unloading, and set-up or installation of merchandise;

(d)    Will provide services in a manner consistent with white glove delivery industry standards;

(e)    Will conform to all applicable federal, state and local laws, regulations and ordinances; and

(f)    Will cause vehicles used to be operated safely and in compliance with all applicable laws and regulations.

3.2    In the event Contract Carrier becomes unable to complete its services obligations under this Agreement, in whole or in part, and/or in accordance with the time requirements imposed, Contract Carrier shall immediately notify XPO Last Mile, which shall have the right, but not the obligation, to provide alternate transportation and delivery services for such freight at Contract Carrier's expense.

3.3    **Tools of the Trade.**   Contract Carrier warrants that it possesses or will at its own expense acquire all equipment including vehicles and tools of the trade necessary to competently perform services pursuant to this Agreement.  Such equipment includes, but is not limited to, handheld mobile computer devices and cellular phones, mobile applications and communication devices capable of reading UPC barcodes or other identifiers as may be used by XPO Last Mile or its customers, as will be communicated to Contract Carrier upon execution of this Agreement and as may be modified from time to time.  Inasmuch as Contract Carrier's capabilities as set forth in this Agreement are essential to providing services, it is agreed that no Payment shall be due and owing to Contract Carrier unless it is fully compliant with this Provision.

      **3.4**     Contract Carrier acknowledges that the use of handheld mobile devices and mobile applications are necessary to document services provided under this Agreement.  Contract Carrier shall use such devices and applications in the completion of its services to XPO Last Mile.  Payment to Contract Carrier shall be contingent on such use.

      **3.5**     **Consumer Safety and Security**.  Contract Carrier recognizes that its services will be performed in residential homes and with regular interaction with XPO Last Mile customer end consumers.  In order to provide a suitable level of security and comfort to such end consumers, Contract Carrier agrees that all of the employees, subcontractors and agents of its company will comply with identification, security and appearance standards applicable to in-home delivery.  Such obligations will include, but not be limited to, Contract Carrier's obligations set forth in Section 14 of this Agreement.

      **4.1**     **Independent Relationship.**   It is expressly intended by the Parties hereto, and Contract Carrier hereby specifically warrants, represents and agrees, that Contract Carrier and XPO Last Mile are independent entities having their own established businesses.  XPO Last Mile and Contract Carrier intend that this Agreement is strictly between two independent entities and does not create an employer/employee relationship for any purpose.  As such, it is agreed between the Parties that Contract Carrier shall have sole control over the manner and means of performing its obligations under this Agreement.

      **4.2**     **Contract Carrier's Discretion.**  It is specifically agreed that Contract Carrier shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results specified above, and no officer, agent or employee of XPO Last Mile shall have the authority to direct Contract Carrier as to the manner or means employed to achieve such objectives and results.  For example, no officer, agent or employee of XPO Last Mile shall have the authority to prescribe hours of work, what route the Contract Carrier is to follow, or other details of service.  XPO Last Mile will not specify or require that a minimum number of hours or a minimum volume of pickups and deliveries be maintained.  If XPO Last Mile or its customer(s) should at any time indicate in any manner its policies or procedures with regard to the specific means by which Contract Carrier shall perform its obligations under this Agreement, such communications shall be construed to be advisory only; the ultimate determination regarding the methods by which the purposes of this Agreement are to be accomplished is entirely committed to Contract Carrier.

      **4.3**     **Maintaining Independence.**

          (a)     Contract Carrier warrants, represents and agrees, except as otherwise provided herein, that neither Contract Carrier nor any of its agents or employees shall advertise or otherwise represent that it or they are (or have been) in any way associated or affiliated with XPO Last Mile or its customer(s), including on loan applications;

          (b)     XPO Last Mile warrants, represents and agrees, except as otherwise provided herein, that neither XPO Last Mile nor any of its agents or employees shall advertise or otherwise represent that it or they are (or have been) in any way associated or affiliated with Contract Carrier;

    (c)    Contract Carrier warrants, represents and agrees, that neither the Contract Carrier nor any of its agents or employees shall make any use whatsoever of the corporate name, trade names or trademarks of XPO Last Mile or its customer(s); and

    (d)    XPO Last Mile warrants, represents and agrees that neither XPO Last Mile nor any of its agents or employees shall make any use whatsoever of the corporate name, trade names or trademarks of Contract Carrier.

**4.4** **Compliance with Laws.** Contract Carrier warrants, represents and agrees that:

    (a)    Contract Carrier does and will pay all contributions, taxes, and other payments or charges required to be paid by an employer in accordance with the provisions of all applicable state unemployment insurance, disability benefits, and withholding tax laws, the Federal Insurance Contributions Act, and Federal Unemployment Tax Act and Federal Internal Revenue Code, and does and will comply with all other local, state, and federal laws, regulations, and requirements applicable to its employees or affecting their compensation or conditions of employment applicable to the Contract Carrier or the performance of its services hereunder;

    (b)    Contract Carrier has obtained all necessary certificates, permits, franchise, operating authority, or licenses required in connection with the performance of such services (including, but without limitation, all applicable regulations relating to the qualifications or maximum hours of service of employees or the safety of operation or standards of equipment), and that it does and will carry Workmen's Compensation and Employer's Liability Insurance;

    (c)    Contract Carrier does not have an unsatisfactory or unfit safety rating issued by any regulatory authority with jurisdiction over Contract Carrier's operations, including but not limited to the Federal Motor Carrier Safety Administration.

    (d)    Contract Carrier agrees to notify XPO Last Mile in writing by certified mail within fifteen (15) calendar days of any event, occurrence, action or representation by Contract Carrier, its officers, employees or agents or by XPO Last Mile and its customers, its officers, employees or agents which, in the Contract Carrier's opinion affects Contract Carrier's ability to act as an independent entity under the terms of the Agreement. The details of such alleged event shall be set forth with specificity, including date, time, place, persons involved, witnesses, and the alleged conduct.

**5.** **Contract Carrier's Employees.** Contract Carrier agrees that it retains complete and exclusive direction and control over its employees and all those working for it in any capacity. As such Contract Carrier may, without prior notice to XPO Last Mile, employ or otherwise

provide qualified person(s) to assist Contract Carrier in performing the obligations specified by this Agreement. All persons so employed or provided by Contract Carrier, either driving or non-driving, shall be qualified pursuant to applicable federal, state and municipal safety standards. All persons employed or provided by Contract Carrier shall be fully trained, at Contract Carrier's expense and discretion, to operate all equipment used in furtherance of this Agreement. Contract Carrier understands and agrees that such persons shall not be considered employees of XPO Last Mile and that it is Contract Carrier's responsibility to assure that such persons conform fully to the applicable obligations undertaken by Contract Carrier pursuant to this Agreement. Contract Carrier further agrees to:

(a) Assume sole responsibility for ensuring that its employees, agents and workers are screened and qualified in accordance with the same standards as Contract Carrier was screened and qualified prior to its engagement for the services to be provided herein, and in conformance with all requirements as may be communicated by XPO Last Mile from time to time;

(b) Bear all expenses associated with qualifying such persons to perform the services agreed to be provided herein, including, without limitation, the cost of physical examinations, background checks and drug screen tests;

(c) Bear all expenses associated with the employment of such persons, including, without limitation, wages, salaries, employment taxes, workers' compensation coverage, health care, retirement benefits and insurance coverages;

(d) Assume sole responsibility with respect to such persons for compliance with all applicable laws, rules, and regulations, including but not limited to wage and hour laws, discrimination law, immigration laws and all laws relating to employment such as orders respecting payroll deductions and maintenance of payroll and employment records; and,

(e) Hold XPO Last Mile and its customers harmless from, and waive any right of subrogation in connection with, any liability and claims by others or by government agencies arising from Contract Carrier's relationship with Contract Carrier's employees, agents, workers or substitutes whether under industrial accident prevention laws or any other federal, state or municipal laws applicable to the relationship between employers and employees, agents or workers.

**6.1** **Bond or Cash Fund.** Contract Carrier shall post a cash bond or maintain a fund to be used for the adjustment of claims between the Parties. Contract Carrier agrees to post the sum of $5,000 per vehicle used in the performance of services under this Agreement, and to maintain such fund at a minimum level of $5,000 per vehicle. Contract Carrier authorizes XPO Last Mile to use the fund to pay for the actual amount of damages for any and each loss or claim resulting from Contract Carrier's services under this Agreement. Contract Carrier shall be strictly liable for all such damages or claims including but not limited to:

(a) Charges for loss of merchandise;

  (b) Damages to merchandise;
  (c) Damages to XPO Last Mile property;
  (d) Damages to other property for which XPO Last Mile may be held liable; and
  (e) Damages to XPO Last Mile client's customer home, person and/or property.

  **6.2** **Withdrawals From Fund.** If the withdrawals from the fund are made at any time during the term of this Agreement and Contract Carrier does not restore the fund to a minimum balance of $5,000 per vehicle, Contract Carrier hereby authorizes XPO Last Mile to retain from any settlements due to it under this Agreement such amounts as shall be required to accumulate the sum of $5,000 per vehicle, as promptly as possible.  The rate and schedule for such retainage shall in no event be less than $100 per settlement.

  **6.3** **Return of Fund.** Upon termination of this Agreement, and provided there are no outstanding claims, threatened litigation or administrative action, pending judgments, or other circumstances related to Contract Carrier's performance under this Agreement which, in the reasonable discretion of XPO Last Mile, could have an adverse impact on its financial interests, and provided Contract Carrier has fulfilled the terms and conditions of this Agreement, all monies remaining in the fund will be returned to Contract Carrier.  At the time of the return of the monies in the fund, XPO Last Mile may, however, withhold amounts sufficient to satisfy any other claims or obligations of Contract Carrier to XPO Last Mile specified by the terms of this Agreement which remain outstanding and shall provide a final accounting in writing to Contract Carrier of all such final withholdings made from the fund.  The net fund balance shall be returned by XPO Last Mile to Contract Carrier no later than forty-five (45) days after the termination of this Agreement.

  **7.** **Loss or Damage To Product.** Unless otherwise noted on a duly executed exception notification document, acceptance of an article for delivery by Contract Carrier shall constitute its acknowledgment that the merchandise was accepted free from damage.  Contract Carrier shall be fully liable for the loss, theft, or destruction of or any damage to any merchandise in its custody or control in the delivery process.  Contract Carrier shall return all damaged merchandise at its expense to the point of origin or, with Contract Carrier's consent, to other points as instructed by XPO Last Mile.  In addition to all other remedies in law and equity, XPO Last Mile shall have the right to offset such damages from Contract Carrier's reconciliation for services performed under this Agreement, provided such amounts are reasonably substantiated.

  **8.** **Damage to Property.** Contract Carrier is responsible for all damage to property during the performance of its services under this Agreement.  All damages to Customer's property must be settled to the customer's satisfaction within seven (7) days of occurrence.  Any damage claim not settled in seven (7) days will be paid directly to the customer by XPO Last Mile and offset on Contract Carrier's reconciliation for services performed under this Agreement.

  **9.1** **Payment.** XPO Last Mile shall pay Contract Carrier within fourteen (14) days following each week of services (Sunday through Saturday) performed by Contract Carrier under this Agreement.

      **9.2**    **Payment Schedules.**  Payment shall be made pursuant to any Schedule A(s) attached hereto and made part of this Agreement.  Such schedule(s) shall be separately negotiated and executed by the Parties and may from time to time be superseded or adjusted by subsequently negotiated and executed Schedule A(s).  Services provided by Contract Carrier under a XPO Last Mile Direct addendum to this Agreement shall be deemed to be separate and apart from services provided under the attached Schedule A(s).  The payment schedule under the Direct addendum is for Direct services only and not added to the Schedule A payment schedule.  Payment agreements under a XPO Last Mile Direct addendum shall not supersede or modify the terms of this Agreement or a Schedule A.

      **9.3**    **Reconciliation.**  On a weekly basis, XPO Last Mile shall reconcile the amount of Payments due to Contract Carrier for services rendered under this Agreement with any offsets for claims or losses resulting from Contract Carrier's services under this Agreement as set forth in Sections 6, 7 and 8 above.  In the event such claims or losses exceed the monies available for offsets to Payments, Contract Carrier authorizes XPO Last Mile to use the fund created under Section 6 to pay such claims or losses.

      **9.4**    Upon termination of this Agreement, XPO Last Mile shall have the right to holdback remaining Payments due until final reconciliation as provided by Section 19.

      **10.**    **Forms and Records.**  XPO Last Mile shall be allowed to reasonably review Contract Carrier's operation to ensure compliance with the terms of this Agreement.  This includes a reasonable review of Contract Carrier's records, and the maintenance of certain information as may be required by XPO Last Mile.  XPO Last Mile may contact customers directly to verify the level of services provided by Contract Carrier.

      **11.**    **Service Commitment.**  Contract Carrier guarantees prompt and efficient service by its agents and employees to the reasonable satisfaction of XPO Last Mile and the end customer.  Prompt service shall include hauling freight at the time it is available for tender by XPO Last Mile to Contract Carrier.  Contract Carrier's failure to provide or arrange for services after its commitment to haul available freight shall be deemed a breach of this Agreement.

      **12.**    **Required Insurance.**  At all times at its own expense, Contract Carrier shall maintain insurance of the kinds and amounts specified in the attached Schedule D attached hereto and made part of this Agreement.

      **13.**    **Haul Away Services.**  In the event haul away services are provided under this Agreement, they shall be undertaken as follows:

      (a)    Contract Carrier shall remove, haul away, and, as applicable, either return or properly dispose of all products as may be specified by XPO Last Mile or its customer.  Contract Carrier shall fully comply with all inventory and documentation requirements pertaining to identification of product(s) and documenting the chain of custody of said product(s) from XPO Last Mile's or its customers' facility to the end point of product disposal.

(b) Contract Carrier further agrees and warrants that it bears the full responsibility for properly disposing of said products, including CFC's, compressor oils and hazardous wastes in accordance with all applicable federal, state and local environmental laws, including laws related to landfill and waste management and all similar laws, rules and regulations. Contract Carrier agrees that in all aspects of its performance under this Agreement, it will comply with all relevant applicable laws and regulations, including federal and as may apply, the state and local jurisdictions within which it operates.

14. **Background Checks.** Contract Carrier acknowledges that individuals it uses to complete its obligations under this Agreement may enter customers' residences or premises, or have direct contact with a customer. Contract Carrier agrees that before any services are provided under this Agreement, it will complete background checks on any individual it uses to complete its obligations under this Agreement, regardless of whether the individual is an employee, owner, or contractor of Contract Carrier. Contract Carrier agrees that it will also complete drug screening consistent with industry standards with respect to all such individuals before services are performed under this Agreement.

(a) Contract Carrier agrees that the background checks and drug screens will be conducted by a reputable and qualified third-party background check service. The background check will include a review of criminal court records of all counties of known residence. If the background check reveals that the individual has been convicted of criminal activity similar to the crimes listed in Schedule B attached hereto and made part of this Agreement, or a drug screen yields a positive result, the Contract Carrier agrees not use the individual to provide services in connection with its services under this Agreement.

(b) Contract Carrier is solely responsible for all costs and other aspects of the background check and drug screening process and disqualification determinations, including compliance with all federal, state and/or local laws in this regard (e.g., providing proper forms, notices, and disclosures to affected individuals, etc.).

(c) Contract Carrier agrees to indemnify and hold harmless XPO Last Mile, to the fullest extent of the law, from any claims, including the cost of defending such claims, related to each background check and/or drug screen, each disqualification determination, and Contract Carrier's failure to properly conduct the background checks as outlined herein.

(d) Contract Carrier shall maintain the results of the criminal background checks for all individuals subject to these background check requirements. The Contract Carrier agrees to certify and document its compliance with this provision, and provide proof of same to XPO Last Mile at its request.

15. **Indemnification.**  CONTRACT CARRIER SHALL AT ALL TIMES (BOTH DURING AND AFTER THE TERM HEREOF) DEFEND, INDEMNIFY AND HOLD HARMLESS XPO LAST MILE, ITS CUSTOMERS, AGENTS, EMPLOYEES, AND AFFILIATES AGAINST AND FROM ANY AND ALL SETTLEMENTS, LOSSES, DAMAGES, COSTS, COUNSEL FEES AND ALL OTHER EXPENSES RELATING TO OR ARISING FROM ANY AND ALL CLAIMS (WHETHER OR NOT GROUNDLESS) OF EVERY NATURE OR CHARACTER (INCLUDING, BUT WITHOUT LIMITATION, CLAIMS FOR PERSONAL INJURY, DEATH AND DAMAGE TO PROPERTY) ASSERTED AGAINST XPO LAST MILE (A) BY CONTRACT CARRIER OR ANY AGENT OR EMPLOYEE OF CONTRACT CARRIER; (B) BY ANY OTHER PERSON OR ENTITY WHOSE ACTIONS OR CLAIMS ARISE OUT OF SERVICES PERFORMED OR ARE IN CONNECTION WITH THIS AGREEMENT; OR (C) BY ANY OTHER PERSON OR ENTITY WHICH ALLEGES ACTS OR OMISSIONS RELATED TO OR ARISING OUT OF SERVICES PERFORMED IN CONNECTION WITH THIS AGREEMENT.  XPO LAST MILE RESERVES THE RIGHT TO OFFSET AGAINST PAYMENT DUE TO CONTRACT CARRIER AMOUNTS FOR CLAIMS XPO LAST MILE REASONABLY BELIEVES ARE DUE UNDER THIS SECTION.  IN THE EVENT SUCH CLAIMS OR LOSSES EXCEED THE MONIES AVAILABLE FOR OFFSETS TO PAYMENTS, CONTRACT CARRIER AUTHORIZES XPO LAST MILE TO USE THE FUND CREATED UNDER SECTION 6 TO PAY SUCH CLAIMS OR LOSSES.

16. **Notices.**  All notes, requests, demands, and other communications hereunder shall be in writing to the Parties at the addresses given below, unless another address shall be furnished to the other party in writing:

>Notices to Contract Carrier shall be sent to:
>
>==Moderno Logistics Corp==
>
>==14302 Ward Rd,==
>
>==orlando, FL  32824==
>
>Notices to XPO Last Mile shall be sent to:
>
>XPO Last Mile, Inc.
>
>6314 Fly Road
>
>East Syracuse, NY  13057

17. **Term of Agreement.**  This Agreement shall become effective on [Effective Date] and shall remain in effect for one year.  The Agreement shall be automatically renewed at the end of the term for a successive one-year term unless either party gives written notice of its intention not to renew fifteen (15) days before expiration of the term.

18.1 **Termination of Agreement.**  This Agreement may be terminated as follows:

a. At any time by mutual written agreement of Contract Carrier and XPO Last Mile Companies;

    b.    By Contract Carrier or XPO Last Mile if the other party breaches or fails to perform the obligations imposed by this Agreement;

    c.    By either party in the event XPO Last Mile: (1) ceases to do business in all or part of the contract area served; or (2) as a result of a decline in business, or a reduction in operations in all or part of the area served by this Agreement; or

    d.    By either party upon fifteen (15) day written notice to the other.

**18.2** **Termination Obligations.** Upon termination of this Agreement for any reason, Contract Carrier agrees promptly to:

    a.    Return to XPO Last Mile any merchandise tendered for delivery, along with any shipping papers, documents, collections or other property of XPO Last Mile in Contract Carrier's possession;

    b.    Return to XPO Last Mile any property of XPO Last Mile furnished to Contract Carrier in connection with Contract Carrier's performance of its services under this Agreement; and

    c.    Remove and return or permanently mask all of XPO Last Mile and/or XPO Last Mile's customers' vehicle identification from all vehicles and/or equipment used pursuant to this Agreement.

**19.** **Final Reconciliation.** Upon termination of this Agreement, final reconciliation, including any holdbacks, will be paid forty-five (45) days from the date of termination.

**20.** **Notice of Agreement Payment Breach.** An "Agreement Payment Breach" is any demand for or controversy involving alleged payments due pursuant to Schedule A of this Agreement or any other amount(s) alleged due to Contract Carrier. Written notice of an "Agreement Payment Breach" must be made within 14 days of the event or occurrence giving rise to such alleged breach or alleged incorrect Payment, and in no event later than 14 days after Final Reconciliation is paid. Written notice shall be made by certified mail to the address set forth in this Agreement, shall contain the heading "Notice of Agreement Payment Breach", and provide a detailed statement specifying the precise nature of the alleged breach. The notice requirements set forth in this Provision shall not apply to any other types of alleged contract breach.

**21.1** **ARBITRATION OF CLAIMS.** The parties agree that any demand, assertion, or claim or cause of action for money, property, enforcement of a right, or equitable relief, including but not limited to allegations of misclassification or wage and hour violations (except as carved out below) arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules (except as may be modified by this Arbitration Agreement), and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof, if

necessary.  In the event of a misclassification dispute, the parties expressly agree to use the commercial rules until a determination of employment statute has been made.  The Commercial Arbitration Rules are available at www.adr.org.  As specified in Paragraph 21.3, this Arbitration Agreement applies to any existing or future dispute brought by either Contract Carrier or XPO Last Mile arising out of or related to the Agreement or Contract Carrier's relationship with XPO Last Mile, including but not limited to allegations of misclassification or wage and hour violations.  The provisions of this Arbitration Agreement will remain in force after the parties' contractual relationship ends.  **BY AGREEING TO ARBITRATE ALL DISPUTES CONTEMPLATED BY THIS ARBITRATION AGREEMENT, THE PARTIES AGREE THAT ALL SUCH DISPUTES WILL BE RESOLVED THROUGH BINDING ARBITRATION BEFORE AN ARBITRATOR AND NOT BY WAY OF A COURT OR JURY TRIAL.**

**21.2** **INAPPLICABILITY TO CERTAIN PENDING LITIGATION**.  This Arbitration Agreement does not apply to claims asserted by settlement class members in any lawsuit that is pending against XPO Last Mile as of the Effective Date (as defined in Paragraph 21.10) that has been settled in principle, provided that (i) the settlement class member does not opt out of the settlement and (2) the settlement receives final approval from the Court.  Any claims asserted by settlement class members who opt out of the settlement in such cases will be subject to this Arbitration Agreement, and if the settlement does not receive final approval, all claims asserted by the settlement-class members will be subject to this Arbitration Agreement.  In addition, this Arbitration Agreement does not apply to claims asserted by the named plaintiffs in any lawsuit pending against the XPO Last Mile as of the Effective Date, or to claims asserted by those Contract Carriers who have expressly consented in writing to join a pending lawsuit as a plaintiff, provided that writing is signed and dated prior to the Effective Date.

**21.3** **APPLICATION TO EXISTING CLAIMS AND CONTROVERSIES**.  This Arbitration Agreement is intended broadly to apply to all covered controversies (as set forth above subject to the exceptions in Paragraphs 21.2 and 21.6), including those arising prior to and after the Effective Date.

**21.4** **MAKING A DEMAND FOR ARBITRATION**.  Any demand for arbitration under this Arbitration Agreement must be submitted to a regional office of the AAA for processing and administration, and a copy of any such demand shall be simultaneously sent to the other party.  The Arbitrator will resolve all disputes regarding the timeliness or propriety of the demand for arbitration.

**21.5** **ENFORCEABILITY**.  Except as noted Paragraph 21.6, the arbitrator, and not any federal, state, or local court, shall have exclusive authority to resolve any dispute relating to the formation, enforceability, applicability, or interpretation of this Arbitration Agreement, including without limitation any claim that this Arbitration Agreement is void or voidable.  Thus, except as noted in Paragraph 21.6, the parties voluntarily waive the right to have a court determine the enforceability of this Arbitration Agreement.  In the event any portion of this Arbitration Agreement is deemed unenforceable, then such portion will be modified or, if modification is not possible, stricken to the extent necessary to allow enforcement of this Arbitration Agreement, and the remaining provisions will remain in full force and effect.

**21.6** **CLASS AND COLLECTIVE ACTION WAIVER**.  **THIS ARBITRATION AGREEMENT PROHIBITS THE ARBITRATOR FROM CONSOLIDATING THE CLAIMS OF OTHERS INTO ONE PROCEEDING.  THIS MEANS AN ARBITRATOR SHALL HEAR ONLY INDIVIDUAL CLAIMS AND IS PROHIBITED FROM FASHIONING A PROCEEDING AS A CLASS OR COLLECTIVE ACTION OR AWARDING RELIEF IN SUCH A PROCEEDING.**  Any question or dispute concerning the

scope or validity of this paragraph shall be decided by a court of competent jurisdiction and not the arbitrator. Should a court determine that this paragraph is invalid for any reason, the parties hereby waive any right to arbitration of a class or collective action and instead agree and stipulate that such claims will be heard only by a judge.

**21.7** **ATTORNEYS' FEES AND ARBITRATION COSTS.** Each party will pay the fees for its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. Costs incidental to the arbitration, including the cost of the Arbitrator and the meeting site ("Arbitration Costs"), will be borne by XPO Last Mile and Contract Carrier equally, unless otherwise required by applicable law. Any dispute regarding a party's obligation to pay Arbitration Costs will be determined by the Arbitrator. In the event Contract Carrier contends that, as a matter of law, it is not responsible for payment of any Arbitration Costs, Contract Carrier will have no obligation to pay any portion of the contested Arbitration Costs until, and only if, the Arbitrator determines that Contract Carrier is responsible for the costs. If necessary for arbitration of the dispute, XPO Last Mile agrees to cover the amount of the Arbitration Costs contested by Contract Carrier until such time as the Arbitrator determines payment responsibility. If the Arbitrator determines that Contract Carrier is responsible for any amount of the Arbitration Costs already paid by XPO Last Mile, Contract Carrier will remit payment of that amount to XPO Last Mile within 30 days of the Arbitrator's determination.

**21.8** **CHOICE OF LAW.** The Arbitrator shall apply the substantive law of the State of Georgia or federal law, or both, as applicable to the claim(s) asserted. The Arbitrator's authority to render a decision shall be bound by the principles of Georgia or federal substantive laws and any decision shall not be contrary to same.

**21.9** **POST-ARBITRATION PROCEDURES.** Within 30 days of the close of the arbitration hearing (which period may be extended by stipulation of the parties), any party will have the right to prepare, serve on the other party, and file with the Arbitrator a post-arbitration brief. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies will be limited to those that would be available to a party in his or her or its individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Agreement. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration without the prior written consent of the parties. A court of competent jurisdiction will have the authority to enter a judgment upon the award made pursuant to the arbitration.

**21.10** **OPT-OUT PROVISION.** If Contract Carrier does not want to be subject to this Arbitration Agreement, Contract Carrier may opt out by notifying XPO Last Mile in writing of Contract Carrier's desire to opt out of this Arbitration Agreement, which writing must be delivered either (1) by email, stating Contract Carrier's name and expressing Contract Carrier's intent not to be subject to this Arbitration Agreement, to arbitrationoptout@xpo.com or (2) by letter dated, signed and submitted by U.S. Mail or hand delivery to Legal Department at 6314 Fly Road, East Syracuse, NY 13057. In order to be effective, the writing must (1) clearly indicate Contract Carrier's intent to opt out of this Arbitration Agreement, and (2) be sent (if delivered via email), post-marked (on the envelope containing the signed writing, if delivered by U.S. Mail), or delivered (if delivered by hand) within 30 days of the date this Arbitration Agreement is signed by Contract Carrier ("Effective Date"). Contract Carrier's writing opting out of this Arbitration Agreement will be filed with a copy of this Arbitration Agreement and maintained by XPO Last Mile. Should Contract Carrier not opt out of this Arbitration Agreement within the 30-day period,

Contract Carrier and XPO Last Mile will be bound by the terms of this Arbitration Agreement. **A UNILATERAL ELECTION BY CONTRACT CARRIER TO OPT OUT WILL NOT RESULT IN TERMINATION OF ANY OTHER AGREEMENT BETWEEN THE PARTIES OR ANY FORM OF PENALTY, RETALIATION, OR DISADVANTAGING OF CONTRACT CARRIER BY XPO LAST MILE.**

21.11   **RIGHT TO CONSULT WITH AN ATTORNEY.**   Contract Carrier has the right to consult with private counsel of Contract Carrier's choice with respect to any aspect of, or any claim that may be subject to, this Arbitration Agreement

22.   **Non-Exclusive Agreement.**   It is understood and agreed that this is a non-exclusive Agreement and there is no requirement for XPO Last Mile to use Contract Carrier's services exclusively or that Contract Carrier exclusively provides services to XPO Last Mile.   Contract Carrier and XPO Last Mile may enter into other agreements for similar services with other parties in any area.

23.   **No Agency Relationship.**   The parties agree and acknowledge that they are separate, unrelated business entities.   Nothing in this Agreement shall be construed to (a) give either Party the power to direct or control the daily activities of the other Party, or (b) constitute the Parties as principal and agent, employer and employee, franchisor and franchisee, partners, joint venturers, co-owners, or otherwise affiliated.

24.   **Intent of the Agreement.**   The intent of the Agreement is to include all items necessary for the proper execution and completion of the services by the Contract Carrier.   Performance by the Contract Carrier shall be required only to the extent consistent with the Agreement and reasonably inferable from the Agreement as being necessary to produce the indicated results.

25.   **Construction.**   This Agreement shall be construed and interpreted fairly, in accordance with the plain meaning of its terms, and there shall be no presumption or inference against the party drafting this Agreement in construing or interpreting the provisions.

26.   **Recitals.**   The statements set forth above in the "Whereas" clauses are affirmed as true and correct and are made part of this Agreement as though more fully set forth herein.

27.   **Assignment.**   This Agreement is binding upon the Parties and their respective successors and assigns, but Contract Carrier's obligations under this Agreement are not assignable without the prior written consent of XPO Last Mile.   Any assignment without XPO Last Mile's consent shall be null and void.

28.   **SEVERABILITY.**   SHOULD ANY PART OF THIS AGREEMENT FOR ANY REASON BE DECLARED BY ANY COURT OF COMPETENT JURISDICTION TO BE INVALID, SUCH DECISION SHALL NOT AFFECT THE VALIDITY OF ANY REMAINING PORTION, WHICH REMAINING PORTION SHALL CONTINUE IN FULL FORCE AND EFFECT AS IF THIS AGREEMENT HAD BEEN EXECUTED WITH THE INVALID PORTION HEREOF ELIMINATED, IT BEING THE INTENTION OF THE PARTIES THAT THEY WOULD HAVE EXECUTED THE REMAINING PORTION OF THIS AGREEMENT WITHOUT INCLUDING ANY SUCH PART, PARTS OR PORTIONS WHICH MAY FOR ANY REASON BE HEREAFTER DECLARED INVALID.

**29.** **Acknowledgement**.   Contract Carrier acknowledges and represents that Contract Carrier has read and fully understands the provisions of this Agreement, and has had sufficient time and opportunity to consult with personal, financial, tax and legal advisors prior to executing this Agreement.

**-- The remainder of this page was intentionally left blank –**

Doc ID: 20210427124735424
Sertifi Electronic Signature

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as set forth below.

**XPO Last Mile, Inc.**

Date: 04/27/2021    By: ==    Kirstie DeMauro                              ==

Title: Specialist, Contracts

Signature:    *Kirstie DeMauro*
kirstie.demauro@xpo.com

**==Moderno Logistics Corp==**

Date: 04/27/2021    By: ==Beltre,Ginette==

Title: ==Business Owner (SP)==

Signature:    *Ginette beltre*
moderncorp2015@yahoo.com